Approved: _David Wikstrom_
DEREK WIKSTROM / JAMES McMAHON
Assistant United States Attorney

Before:    THE HONORABLE ANDREW E. KRAUSE
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - X
                                  :
UNITED STATES OF AMERICA          :   **SEALED COMPLAINT** 21mj1991
                                  :
                                  :   Violations of 18 U.S.C.
   - v. -                         :   §§ 1956 and 2
                                  :
DANIEL RESNICK,                   :   COUNTIES OF OFFENSE:
                                  :   SULLIVAN; NEW YORK
                    Defendant.    :
                                  :
- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JOSEPH CALVELLO, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

### COUNT ONE
(Money Laundering)

        1.    From in or about August 2019 through in or about
November 2020, in the Southern District of New York and
elsewhere, DANIEL RESNICK, the defendant, conducted and
attempted to conduct financial transactions involving property
represented by a member of law enforcement to be the proceeds of
specified unlawful activity, to wit, the proceeds of fraud in
the sale of securities, with the intent to conceal and disguise
the nature, location, source, ownership, and control of such
property.

    (Title 18, United States Code, Sections 1956(a)(3)(B) and 2.)

        The bases for my knowledge and for the foregoing charge
are, in part, as follows:

        2.    I am a Special Agent with the FBI, and I have
been involved in the investigation of the above-described
offenses. This affidavit is based upon my personal participation

in the investigation of this matter, as well as on my conversations with other law enforcement officers and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the investigation. Where the contents of documents or the actions, statements, or conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

3.     Based on my conversations with other law enforcement agents, my review of reports and records, and my participation in this investigation, I have learned, among other things, the following:

a.   DANIEL RESNICK, the defendant, is a businessman operating in Sullivan County, New York. RESNICK owns a number of real properties, and operates a number of companies—including an entity called Resnick Supermarket Equipment Corp. ("RSE")—in and around Fallsburg, New York, in Sullivan County.

b.   In or about August 2019, an undercover law enforcement officer ("UC-1") was introduced to DANIEL RESNICK, the defendant, by a confidential source working with law enforcement (the "CS").[1] The CS made this introduction after having conversations with RESNICK in which RESNICK indicated that he could assist the CS in arranging money laundering transactions.

c.   Between in or about August 2019 and in or about November 2020, RESNICK accepted a total of approximately $1 million in payments from UC-1 (or from others, including the CS,

---

[1] On or about March 11, 2013, the CS pleaded guilty to 18 felony counts, including one count of conspiracy to commit wire fraud, one count of wire fraud, three counts of conspiracy to commit bank fraud, eight counts of bank fraud, one count of bankruptcy fraud, one count of mail fraud, one count of honest services mail fraud, one count of bribery of a foreign official, and one count of perjury, as a result of conduct unrelated to this investigation. The CS is cooperating with law enforcement in the hopes of receiving leniency at sentencing in connection with those charges. The CS does not have any other criminal history. Information provided by the CS has proven reliable, and has in some instances been corroborated by other evidence developed during the course of this investigation.

on UC-1's behalf) that UC-1 represented were proceeds of
securities fraud schemes. RESNICK used the entities and bank
accounts he controlled to conduct financial transactions with
that money, returning some of it--less a percentage fee, which
RESNICK kept--via check, wire transfer, or cash.

<u>RESNICK's Money Laundering Conversations with the CS</u>

4.    On or about May 21, 2019, DANIEL RESNICK, the
defendant, and the CS spoke by phone. The call was consensually
recorded. Based on my review of the recording, I know that the
CS asked RESNICK, in substance and in part, whether RESNICK
could connect the CS with "someone who has cash...that wants to
change it, that wants to sell." RESNICK responded, in substance
and in part, "They're gonna charge you...probably 15%."[2]

5.    On or about July 26, 2019, DANIEL RESNICK, the
defendant, and the CS met in person at a certain address on Wild
Turnpike in Mountaindale, New York that is the business address
of RESNICK's company RSE (the "Wild Turnpike Address"). Before
the meeting, members of the FBI investigative team gave the CS a
check for $20,000, to give to RESNICK to launder. The meeting
was recorded by the CS. Based on my review of that recording, I
have learned, among other things, the following:

a.    During the meeting, the CS suggested
introducing RESNICK to UC-1. The CS described UC-1 as someone
who is involved in maintaining an artificially high price of a
certain stock related to a car battery. The CS told RESNICK, in
substance and in part, "It's not on the market yet. He [i.e.,
UC-1] has to keep it over a buck...until it goes to Wall Street,
we need to keep it up to a certain price..." The CS also stated
"It's a sca--it's a gimmick," with the CS pronouncing the word
"sca" as if he were starting to say the word "scam."

b.    The CS and RESNICK also discussed possible
scenarios in which RESNICK would accept UC-1's money and then
return it using checks or cash. RESNICK stated, in substance and
in part, "Checks, writing checks back, I could do whatever I
want...I can do whatever I want with writing checks...I'll write
checks in an[d] out I don't care, I don't care...and I'm sure I
can come up with a couple hundred thousand in cash."

---

[2] Throughout this Complaint, quotations from recordings of phone
calls and meetings are reported based on my review of the
relevant portions of the recordings.

c.    Based on my discussions with the CS, I know that RESNICK accepted the $20,000 check from the CS, and agreed to return $18,000 to the CS.

RESNICK Meets UC-1 and Agrees to Launder Proceeds of Securities Fraud

6.    On or about August 14, 2019, DANIEL RESNICK, the defendant, met with the CS and UC-1 on a boat in the vicinity of downtown Manhattan, New York. During this meeting, which was consensually recorded, RESNICK was introduced to UC-1. Also during the meeting, RESNICK handed the CS a check for $18,000 drawn on an account in the name of RESNICK's company RSE. Based on my review of the recording of the meeting, I have learned, among other things, the following:

a.    During the meeting, UC-1 told RESNICK that UC-1 was a "stock promoter," and that he was "involved in promoting…these U.S. over-the-counter stocks."

b.    UC-1 explained to RESNICK that "we're pumping up the stock and once we get that stock priced to a certain nice high bullshit price that doesn't really exist we sell the shit out of it from our offshore accounts…and then um we have a lot of cash in those accounts, sitting offshore in those accounts…and…obviously we wanna spend it and I gotta pay people. I gotta pay brokers I gotta kick back like we generally get them like 15, 20 points…so anyway we got to move monies around to take care of the people that are helping us in this…whole process."

c.    UC-1 told RESNICK that the CS helps the UC move money around, including by getting "cash kickbacks" to the brokers and by obtaining cash for UC-1. UC-1 also told RESNICK "I know he gave you the one twenty grand check um that's just a small piece of the whole pie that I'm involved in."

d.    UC-1 stated that he wanted RESNICK's help with "cleaning money and stuff like that."

e.    UC-1 asked RESNICK "can you do wires or just checks?" RESNICK responded "I probably could I mean I don't see why I wouldn't…I have one company that I've had for years and years and years that I use. Never done a tax return on it, it just sits there um monies go in monies go out…"

f.    UC-1 asked RESNICK "if we could…ramp up…with the monies, the checks, and stuff like that you think we could

4

continue to do that? RESNICK responded "Yeah I told him [*i.e.* the CS] that I can do some more."

g.   At the end of the meeting, the CS handed RESNICK a check for $50,000, which the FBI had provided to the CS to give to RESNICK to launder.

7.   On or about August 15, 2019, the day after DANIEL RESNICK, the defendant, was introduced to UC-1, the CS placed a consensually recorded phone call to RESNICK. Based on my review of the recording of that call, I know that RESNICK and the CS had the following exchange, in substance and in part:

RESNICK:   I can do that and give back you know, after two weeks give back the 8 checks, so he can deposit them every week, and gets rid of a half a million, well he already gave me 50, he needs to give me 450 more. …I don't want one check.  It needs to be a bunch of different checks….

CS:   And what, you will wire it back?

RESNICK:   No, I will give him checks to deposit, so I could put it through my books properly, like returned merchandise…. I could put it through my books so it is clean.

CS:   And you want it, it has done by today?  I want him to meet you today, I mean.

RESNICK:   I mean…we could have done it two weeks ago…. But now that I met him, and now…it is a little easier to understand it.  The way you explained it was, this electrical thing, but it's not, it is just offshore accounts.

CS:   Right, I mean, I didn't want to go that dirty and just tell you like uhh.

RESNICK:   This is much easier…. I can do it, I can give it back to him over 8 weeks, and I put it through my books as returned merchandise, and it is done.  It is very simple….

…

RESNICK:   Well…I am offering it to you guys…. I talked to some people on my way home yesterday, where I can put money out…

...

CS:        I have to trust you so basically 500 for uh, 8
           weeks, right?

RESNICK:   No, well, I have to give him back 400, so I give him
           400 in 8 different checks.  And he deposits them
           into, it's got to be LLCs…and I do returned
           merchandise….  That's the way I do it for a couple
           people.  You know what I mean?  Not just you.  This
           is not the first time.  Now that I understand it, it
           is the same thing I did before.

## RESNICK Repeatedly Accepts and Launders Payments from or on Behalf of UC-1

      8.    Based on my review of recordings of phone calls
and meetings, my discussions with other law enforcement
officers, and my review of law enforcement reports, I know that
in a series of ensuing meetings, DANIEL RESNICK, the defendant,
accepted checks represented to be from or on behalf of UC-1, in
exchange for other checks, wire transfers, or cash payments from
RESNICK, other persons working with him, or entities RESNICK
controlled, to persons represented to be working with UC-1.
Specifically, I have learned, among other things, the following:

           a.    On or about September 3, 2019, DANIEL RESNICK,
the defendant, spoke by phone with the CS. RESNICK told the CS,
in substance and in part, that he wanted to meet to get a check
from the CS, and the CS gave RESNICK contact information for a
person who the CS identified as UC-1's "associate," and who was
actually another undercover law enforcement officer ("UC-2").
RESNICK then contacted and arranged to meet with UC-2, and on or
about September 3, 2019, RESNICK met UC-2 in midtown Manhattan.
At the meeting, UC-2 handed RESNICK a $100,000 check, which UC-2
stated was from UC-1. In turn, RESNICK handed UC-2 a $40,000
check, drawn on an account held in the name of RSE, representing
the return of the $50,000 given to RESNICK on or about August
14, 2019, less a 20% fee kept by RESNICK.

           b.    On or about September 18, 2019, RESNICK met
with the CS and UC-2 in midtown Manhattan. During that meeting,
UC-2 handed RESNICK a $100,000 check, which UC-2 stated was from
UC-1, and RESNICK handed UC-2 two checks in the amount of
$40,000 each-- drawn on an account held in the name of RSE--
representing the return of the $100,000 that UC-2 gave to

RESNICK on or about September 3, 2019, less a 20% fee kept by RESNICK.[3]

      c.    On or about January 21, 2020, RESNICK met with the CS in midtown Manhattan. During the meeting, the CS handed RESNICK a $200,000 bank check to launder on behalf of UC-1. RESNICK then arranged a $160,000 wire transfer to an account provided to him by the CS, representing the return of the $200,000 bank check from that same day, less RESNICK's 20% fee. On or about January 21, 2020, an operational account controlled by the FBI received a $160,000 wire transfer from a bank account controlled by RESNICK.

      d.    On or about January 24, 2020, RESNICK met with another undercover law enforcement officer ("UC-3") at the Wild Turnpike Address. In advance of this meeting, the CS told RESNICK that UC-3 was working with UC-1, and would be delivering a check and receiving cash on behalf of UC-1. At the meeting, UC-3 handed RESNICK a $120,000 check, and RESNICK handed UC-3 approximately $100,100 in cash in return for that check.[4]

      e.    On or about September 1, 2020, RESNICK and an associate of RESNICK's ("CC-1") met with the CS in the vicinity of Ozone Park in Queens, New York. During the meeting, the CS handed a $200,000 bank check--which, at RESNICK's direction, the CS had made out to CC-1--to CC-1. In exchange, CC-1 handed the CS approximately $200,000 in cash.[5]

---

[3] Two of the three $40,000 checks RESNICK provided to UC-2 in or about September 2019 bounced. After the second check bounced, the FBI did not attempt to deposit the third $40,000 check. RESNICK subsequently made partial repayment for these checks, as described below.

[4] Based on my participation in this investigation, I believe that this transaction was intended to be an exchange of a $120,000 bank check for $96,000 in cash, but the actual amount of cash handed to UC-3 at this January 24, 2020 meeting was $100,100.

[5] Based on my participation in this investigation, I believe that this transaction was intended to be an exchange of a $200,000 bank check for $200,000 in cash, but the actual amount of cash handed to the CS at this September 1, 2020 meeting was $200,300. RESNICK did not take his customary 20%, or $40,000, fee on this transaction as repayment to UC-1 for a previous check from RESNICK in the amount of $40,000, which did not clear.

        9.    On or about November 5, 2020, DANIEL RESNICK, the
defendant, met with the CS and another person (who was an
associate of the CS's) in midtown Manhattan. During the meeting,
the CS handed a $350,000 bank check to RESNICK, and in exchange,
RESNICK handed approximately $350,000 in cash, concealed in a
cereal box, to the CS.[6]

        WHEREFORE, the deponent respectfully requests that a
warrant be issued for the arrest of DANIEL RESNICK, the
defendant, and that he be imprisoned or bailed, as the case may
be.

                    _J Calvello_____
                    JOSEPH CALVELLO
                    Special Agent
                    Federal Bureau of Investigation


Sworn to before me this

15th day of December, 2021

_Andrew Krause_____
THE HONORABLE ANDREW E. KRAUSE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


---

[6] Based on my participation in this investigation, I believe that
this transaction was intended to be an exchange of a $350,000
bank check for $350,000 in cash, but the actual amount of cash
handed to the CS at this November 5, 2020 meeting was $350,800.
RESNICK again did not take his customary 20%, or $70,000 fee on
this transaction, as partial repayment to UC-1 for two previous
checks in the total amount of $80,000, which did not clear.